Our final case for argument today is Sosinski v. Saul. Mr. Scarr. Good morning, or afternoon I guess we've gotten into. Now may I please record I am Daniel Scarr, attorney for the plaintiff's appellant James Sosinski. This case is on appeal from the decision of the United States District Court of the Eastern District of Wisconsin, which affirmed the administration's denial of Mr. Sosinski's social security disability benefits. There's quite a bit of medical issues, but outside of medical issues, it's good to look at his work history and examine how he got here. Prior to the onset of his disability, he had a really astounding work history for just a high school graduate. He started working for the same drinking company he worked for basically until his disability, right out of high school for 16 years, working his way up as just a laborer and attending skill classes and on-the-job training. And finally, he was worked up to the highest rung to have their master printer with every quarterly earnings from 1987 when he was a freshman in high school. So his disability started in 2009 with his freak injury with increasing wages all the way through. Mr. Scarr, Judge Hamilton, the ALJ in this case emphasized the conservative and routine treatment, I think, of Mr. Sosinski's pain. Does the record tell us why surgery was not used to try to address his back issues? Yes, Your Honor. He had a nerve issue in his back, and they decided that being not like a, if you're going to do a fusion surgery or some type of surgery like that would be okay, but when you have the nerve, they didn't think getting to that nerve was possible, as he was told. And so he basically found a neurologist in 2010, Dr. Gu, and he stuck with him from 2010 all the way through the end of the records. He still sees him today. And he tried all kinds of alternative options with epidural steroid injections. He did that three times, went through at least two physical therapy regimens, and then he went to some special outside clinics and even tried to get a referral for the Mayo Clinic. So outside of Dr. Gu, he was pretty low on money, obviously, because he couldn't work. I think he did a pretty good job of trying to get the treatment that was available. Well, one of the things that concerns me about the arguments you're making here is that I don't see a doctor having found more severe limits for his residual functional capacity than the ALJ found. Am I overlooking something? Well, it's just Dr. Gu, Your Honor, and unfortunately he was the one. He did make a medical store statement. It wasn't a statement that included specific limitations, but when he started, a lot of these doctors are very nervous with malpractice insurance and such to give these type of medical opinions that are really needed in these cases when you're talking about function-by-function residual capacity assessments. So he made that earlier statement, and he found the same kind of limitations from the day he started that statement to the day he had his last record hearing. What do we do? The ALJ also really emphasized the medical findings on exams showing normal strength, full range of motion, and independent gait and so on. Yes. And with that and the absence of more restrictive residual functional capacity findings, it looks like there's a fair amount of support for the ALJ's decision. What's wrong with that perspective? Well, there's so many omissions in this decision. It's a very generalized decision, and that's why I did the footnotes that start on page 36 of the original brief, and I cover every single appointment from March of 2010 with Dr. Gu. And I tell you what was said in the records and what was omitted in the decision. And basically only 33% of the actual appointments were even cited in the decisions, and the majority of the appointments cited in the decisions omitted most of the most important evidence. So basically what we have here is just cherry picking, and that's what was done, and it looks good on paper when you throw it in a paragraph in a decision, but when you can't back it up with the medical records with all the omissions that were made. Mr. Scarr, it's Judge Scudder. I want you to explain a point that you made in your reply brief that I just wasn't sure that I grasped. I haven't seen the argument before, and it's the point that where you're distinguishing, you're trying to make a distinction between an initial RFC assessment and a final RFC assessment. That's an important point. Yeah, what is the point you're trying to make? I don't know that I got it. Okay, we're talking about the Social Security ruling that requires the function-by-function assessment, and this is the Jeske case that was ruled on a couple months ago by this court, and that the actual defendant brought in, he put something in the record yesterday about it. It's an important case. And I think if you'll allow me, I'll kind of go through that, and I'll answer your question. These Social Security rulings are actually binding on even the Court of Appeals. The hallux that I referenced in my brief only allows even circuit courts to overrule what is in these rulings unless there's an acquiescence ruling published, and there is no acquiescence ruling in the Seventh Circuit or any circuit for the SSR, which requires this function-by-function RFC assessment, where you have to lay out all the different functionings and how the plaintiff is limited. And that ruling is what was talked about here. I was responding to the fact that the ruling holds that the initial RFC assessment, that's the one that's blocked out usually at the very beginning of the decision. It talks about lifting, carrying, but it's supposed to talk about all seven strength demands, which didn't happen here. But the same ruling talks about a later RFC assessment. That's a step five. Basically what the ruling is saying is when you're talking to a vocational expert, you don't have to go back and say all seven strength demands. You can, at that point, use the word light if it's not restricted because the vocational expert is supposed to know what a light RFC is or a sedentary RFC. So the ruling has basically two sections, and the defendant had to kind of bootstrap the second section as overriding the first, which is binding on the district court and circuit court and requires that function-by-function RFC assessment. I hope that answers your question. Yeah, I think so. What I was trying to do, I think what I'm still at a loss to figure out, is how you map what you just said onto an error in the ALJ's opinion. So as you were saying what you were saying, I was looking at the ALJ's opinion to try to figure out where you think the error is. So the ALJ, I'll go back to the RFC, he says perform light work. This is the initial RFC assessment required to have the seven functions by the ruling. He says light work, and he doesn't talk about how much you can walk, how much you can stand, how much you can lift, how much you can carry. Those all have to be outlined function-by-function so that you can actually see what the restrictions are. You can use the word light when talking to a vocational expert, but when this initial function-by-function does not contain a function-by-function assessment as required by the ruling. Okay, I think I follow you. All right. Any other questions on that? I'll move along to, again, I think that covers the Jetski case and the function-by-function, which I think is a great thing. I think you're now in your rebuttal time. Okay, I will hold off there then, Your Honor. Thank you. Thank you, Mr. Starr. Mr. Shepard. May it please the Court, Eric Shepard on behalf of the Commissioner, and I'm here today to explain to you why you should affirm the District Court's decision and the ALJ's decision. As was alluded to in the judges' questionings, the medical opinions for the period issue in this case, which begins November 15, 2012, were unanimous and they were clear. They said that Mr. Sasinski should do the work that was described in the ALJ's residual functional capacity. I'd like to particularly alert the Court's attention to Dr. Paspan's March 2015 opinion. It thoroughly recounted the evidence, and those medical opinions are substantial evidence supporting the ALJ's findings. I'd also like to alert the Court's attention to what the treatment providers did not say during the period of issue. No one said that any of Mr. Sasinski's conditions were particularly serious, needed to be addressed particularly urgently, or showed significant deterioration. And if we focus in on the unrefuted final paragraph of the residual functional capacity findings on page 12 of the Commissioner's Appendix, it really crystallizes the ALJ's reasoning. It shows why the ALJ chose the doctor's opinions over plaintiff's testimony, which was the only evidence that he presented of disabling function. The ALJ explained quite clearly that the medications that Sasinski was on remained the same, that he reported improvement from injections, and the ALJ carefully weighed abnormal clinical signs against signs indicating adequate functioning and reasonably determined that the state agency doctor had more accurately assessed Sasinski's functioning. That was substantial evidence right there, and it's unrefuted, and that is why the ALJ confirmed it. Mr. Shepard, let me ask you what troubles me here on your side of the case, and that is this notion that sort of his treatment was stable. As I understand this evidence, he's already on oxycodone, very strong narcotic painkillers. He's still experiencing breakthrough pain, and I don't know how the doctors could have gone beyond where they were with pain treatment, and does the agency see people working regularly on this kind of a drug regimen for painkilling? Well, I can't answer the question whether the agency regularly sees people working on this pain regimen. I can say that it's not per se disabling, and I can also say that even as much as what the medications were, what's really important to focus on here is that the medications didn't change. They stayed the same throughout the whole procedure. Should they have been escalated, and if so, to what level? I can't give you a specific level. What I think is reasonable for the ALJ to conclude is that if Sasinski's condition was deteriorating significantly, from the time he was found not disabled in November 14, 2012, there would have been at least serious consideration about changing the treatment or upping the drugs or some kind of other course or some sense of urgency from the doctors, and that's just not here in this case. And, in fact, quite the opposite. Sasinski tells his treatment providers that injections he got improved his pain and continue to improve his pain. So when you combine that with the ALJ's thorough analysis of the clinical evidence and the doctor's opinions, that's substantial evidence to go with the doctor's opinions. What should we make of the absence of discussion of the carpal tunnel syndrome in the residual functional capacity? I don't think that there's anything to be made of the absence of that discussion. First of all, Sasinski himself never alleged any specific limitations related to carpal tunnel syndrome. He was asked at the hearing what kind of manipulative limitations he had, and he couldn't come up with any kind of a specific answer. The other thing is no doctors or no treatment providers said carpal tunnel syndrome caused any specific limitations, and, in fact, Dr. Tan's opinion in particular addressed carpal tunnel syndrome in the analysis and came to the conclusion that Sasinski could do the work that was described in the RFC finding, which contained limitations on lifting and climbing and things related to carpal tunnel. So Sasinski doesn't produce any evidence, let alone persuasive evidence, that carpal tunnel syndrome was responsible for any limitation that was not already there in the RFC finding. So to address very quickly the work history that Sasinski brought up, the court has been clear that work history doesn't always have to be considered, and Sasinski, in fact, was not employed and deemed not disabled by the agency four years before his alleged onset date in this case, November 15, 2012. And so it's not as if the work history is particularly compelling evidence that the ALJ needed to specifically address in a subjective symptom finding, which, again, can be minimally articulated, you know, just have to get across the reasons, the supportable reasons why the ALJ determined what the ALJ did, and the ALJ did that in this case. Sasinski also raised the Jepke decision, which I think is very applicable to this case. We submitted a supplemental authority yesterday. It really addresses almost completely on point two of the issues on this case. The first, that involves the listings, which, again, no doctor said that Sasinski met any listing. And when the ALJ asked Sasinski's lawyer at the hearing to name a listing that he met, Sasinski's lawyer couldn't provide one. Jepke really emphasizes that in circumstances like the one in this case, the ALJ doesn't have to devote much attention to any specific listing analysis, and that's exactly what happened here. The ALJ provided a reasonable analysis, given the lack of evidence that Sasinski has provided that he met any of the listings. Jepke also talks about the function-by-function, seven-strengths-demand argument that counsel raises and really emphasizes that it's not necessary. Court after court after court has emphasized that this articulation is not necessary, unless there's specific conflicts that need to be resolved. And in this case, Sasinski has not brought forth any unresolved conflicts that needed to be resolved. Finally, I'd like to touch on Dr. Dewey's statement, which was from December 2011, so before the period of issue. The agency determined it was not accurate through November 14, 2012, and Sasinski has provided absolutely no reason why it would become more accurate after that date. And also, I think Dr. Dewey's statement, the fact that that statement was there, shows you that Sasinski's attorney could have gone to Dr. Dewey to get an updated statement or opinion for the period of issue. Mr. Shepard, you're right at the end of your time, so you're going to want to wrap up. Okay. And so I just, you know, the unanimous opinions of the medical experts provided substantial evidence to support the ALJ's decision, which the court should affirm. Thank you. Thank you, counsel. Anything further, Mr. Scarr? I guess I got about a minute, Your Honor. I'll try. As far as the state agency opinions were based on less evidence than the ALJ even talked about. They were not based on substantial evidence. His carpal tunnel syndrome was proven by EMG testing, so it was proven that he had it. And, in fact, my brief shows that he has a lot of limitations that weren't discussed yet, but the brief shows where they are. His headaches haven't been discussed at all. That's further in my brief. His headaches alone look like they are probably disabling. In fact, I'm sure they are two to three times a week. He was getting headaches sometimes. The difference in how often they are. And he did go under epidural steroid injections, with the first one providing some relief and the second providing none. He went through physical therapy right before the decision, which almost destroyed him. It didn't make anything better. He was so much worse. Thank you for your attention. Thank you, Mr. Scarr. The case will be taken under advisement and the court will be in recess. Good day. Anything you want to tell me?